Filed 2/13/25  P. v. Cover CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>LONNIE COVER,<br><br>    Defendant and Appellant. | G064306<br><br>(Super. Ct. No. FSB19004336)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of San Bernardino County, Ronald Christianson, Judge. Affirmed in part and remanded with instructions.

Robert E. Boyce, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal, Kristine A. Gutierrez, and Susan Elizabeth Miller, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

Lonnie Cover was convicted of the first-degree murder of his fellow gang member. The jury found true multiple special circumstances, including lying in wait, killing for financial gain, and killing to further the activities of a criminal street gang. He was sentenced to life without the possibility of parole and appealed from the judgment.

Cover contends the evidence was insufficient to support the special circumstances. We hold the evidence was sufficient to support murder for financial gain. Consequently, we need not address the other special circumstances.

Cover also contends that the gang findings must be vacated in light of the new requirements of Penal Code section 186.22, effective January 1, 2022. The People concede the issue, and we agree. We will remand to vacate the gang enhancements, but otherwise we affirm the judgment.

FACTS

On the evening of September 10, 2018, Samantha S. had plans to hang out with her friends Michael Spinks, who she knew as T.R., and Aranda at Spinks's apartment. Around 10:30 or 11 p.m., Spinks arrived at Samantha's house to pick her up. He was with "Baby Beary," later identified as Cover. After stopping at a liquor store, the three drove to Spink's apartment complex. A group of people were hanging out in the parking lot drinking.

Spinks and Samantha went to his apartment and started drinking. About ten minutes later, Cover and another individual knocked on the door. Samantha did not want to hang out with anyone else, and Spinks said he would get rid of them. However, Spinks went to the door and about five minutes later, they all came inside. Spinks went back to the kitchen, and Cover and the other individual sat down on the couch in the living room. Samantha's friend, known simply as "Aranda," came in at one point, but

2

was, in Samantha's words, acting "weird," and left shortly after. Samantha felt uncomfortable because Cover and the other individual were staring at her and Spinks. Cover was also fidgeting with his backpack. He kept putting it on and taking it off. About 10 minutes after Aranda left, Cover's friend abruptly got up and left, leaving the front door open after exiting. A minute or two later, Cover stood up and started looking for something around the living room. Spinks asked Cover, "Are you okay, bro? You good? What you looking for?" Cover merely responded, "Yeah."

Cover then walked out the front door and partially closed it. About 30 seconds later, Spinks walked to the door and said to Samantha, "I'm going to walk them out, . . . make sure you lock the door and don't answer it. I got my key."

As Spinks was standing in the doorway opening the door, Samantha heard Spinks say, "bro" and immediately reached for her. She then heard a gunshot from right outside the door, and Spinks fell flat onto his back. He had blood coming out of his mouth. Samantha could not see the other side of the door and did not see who shot Spinks. Samantha hid behind the stove and called 911. She then ran out the back door to a neighboring apartment.

When police arrived at the scene of the shooting, police observed Spinks lying on his back in the doorway of his apartment with a gunshot wound to his head. His feet were just outside the threshold of the door and his torso and head were inside the apartment. The bullet entered Spinks's left temple and exited the right side of the back of his head. A bullet casing was found just outside the threshold of the front door and a fired bullet was located inside the apartment. Based on the location of the injuries and the damage from the bullet to the front door, Spinks was facing the door, which

3

was partially opened, at the time he was shot. Spinks was either opening or closing the door at the time.

Several hours after Spinks was shot, Cover was stopped by the California Highway Patrol because he appeared to be driving under the influence. Cover lied to police about his name. Police administered a series of field sobriety tests to Cover and subsequently arrested him for driving under the influence.

Police searched the vehicle and located a loaded handgun under the driver's seat. The handgun had a capacity to hold 18 bullets. The magazine had 16 bullets, with one bullet in the chamber. The bullet casing found inside the threshold of Spinks's front door was fired from the handgun found under the driver's seat of Cover's car.

Sometime after Cover was taken to jail, he made a phone call to a friend. The call was played for the jury. Cover and the friend greeted one another by saying, "Northside." After the friend asked Cover how he was doing, the friend asked Cover, "Shit, cuh, damn what happened though cuh, like it was what, cuz like why b--"? Cover replied, "I came back from Alabama, cuh, they was talking about cuh had robbed Big Beary. It's emotion. Now Beary is telling me cuz got to go. (Unintelligible) was in on it and cuh in so many words Cuz told me that he was in on it. And niggas basically, cuh, like uh get 'em. Cuz didn't want him around, nothing. Cuh didn't want the nigga to come to the spot. Or none of that cuh. And everything was just weird as fuck cuh on the set." Moore responded, "Yeah, yeah. They-they but they just wanted you to beat him up though yeah." Cover replied, "Nah they didn't want – cuh wanted cuh put bread on cuz head." Cover also said, "Yeah, cuz. That's how, [B]ub put for some bread, some change on cuz head." Cover continued, "Yeah, cuh on-on the set was 10 deep

on cuz head. That was not, that was it you, he was missing 100 thousand." Moore asked if "he" was going to pay Cover. Cover replied, "Nah. I, I was trying get at cuh, like cuh what the fuck like you know what's going on cuh. Like cuh everything, like it-it why you leaving like that though, nigga, on the set. I already got at cuh about that and wrote him a letter too." The call ended with Cover saying "Northside."

At trial, a gang expert testified that Cover was a member of the Fontana Tracc Gang, which is affiliated with the Crips. He further testified that, in his opinion, Cover committed the crimes for the benefit of the gang.

STATEMENT OF THE CASE

On August 31, 2022, a jury convicted Cover of first-degree murder (Pen. Code, § 187, subd. (a); count 1)[1] and being a felon in possession of a firearm (§ 29800, subd. (a)(1); count 2). As to the murder conviction, the jury found the special circumstances true that the murder was committed for financial gain (§ 190.2, subd. (a)(1)), by means of lying in wait (§ 190.2, subd. (a)(15)), and to further the activities of a criminal street gang (§ 190.2, subd. (a)(22)). As to both counts, it was found true that Cover committed the offenses for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)). It was further found as to the murder conviction that Cover personally used a firearm (§ 12022.53, subd. (b)), personally and intentionally discharged a firearm (§ 12022.53, subd. (c)), and personally and intentionally discharged a firearm that caused death (§ 12022.53, subd. (d)).

On January 27, 2023, the court sentenced Cover to an indeterminate term of life without the possibility of parole for first degree murder, and a consecutive enhancement of 25 years to life for the discharge

---

[1] All statutory references are to the Penal Code.

5

of a firearm causing death. The court imposed a consecutive determinate term of two years for being a felon in possession of a firearm, and three years for the gang enhancement attached to that count. The court imposed ten years for the section 12022.53, subdivision (b) enhancement and 20 years for the section 12022.53, subdivision (c) enhancement, but stayed the sentences on those enhancements. The court also imposed, but struck, a ten-year sentence for the gang enhancement attached to the murder conviction. Cover appealed.

## DISCUSSION

## I.

### SUBSTANTIAL EVIDENCE SUPPORTS THE SPECIAL CIRCUMSTANCE OF KILLING FOR FINANCIAL GAIN

Cover first contends substantial evidence does not support each of the three special circumstances. Because we conclude the evidence supported a killing for financial gain, we need not consider whether substantial evidence supports the other two special circumstances (lying in wait, and killing for the benefit of a gang).

"In reviewing a sufficiency of evidence claim, the reviewing court's role is a limited one." (*People v. Smith* (2005) 37 Cal.4th 733, 738.) "'The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.'" (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) "In making this determination, the reviewing court must consider the evidence in a light most favorable to the judgment and presume

6

the existence of every fact the trier could reasonably deduce from the evidence in support of the judgment." (*People v. Crittenden* (1994) 9 Cal.4th 83, 139.)

Section 190.2, subdivision (a)(1), provides that a defendant is subject to a penalty of death or life imprisonment without the possibility of parole if it is found to be true that "[t]he murder was intentional and carried out for financial gain." The financial gain does not need to be the dominant, substantial, or even a significant motive for the murder. (*People v. Parker* (2022) 13 Cal.5th 1, 63.) Nor does a defendant need to actually obtain the financial gain sought. (*Ibid.*) The question is simply whether a motive for the murder was the expectation of financial gain. (*Ibid.*)

Here, the evidence amply supports that finding. In his jailhouse phone call, Cover stated that he committed murder, rather than simply beat Spinks up, because more senior gang members had "put bread on cuz head." He went on to say they had put "some change on cuz head." "Yeah, cuh on-on the set was 10 deep on cuz head." This was because the victim was believed to have stolen money from higher ups. A gang expert testified that the language Cover used meant that a $10,000 bounty had been placed on Spinks's life. This evidence was sufficient for a jury to find Cover was motivated, at least in part, by the expectation of financial gain.

## II.

### THE GANG ENHANCEMENTS MUST BE VACATED

Cover contends, and the Attorney General agrees, that the gang enhancements and special circumstance finding must be vacated in light of the changes to section 186.22 enacted by Assembly Bill No. 333 (Stats. 2021, ch. 699; Assembly Bill 333), which made substantial changes to how a "criminal street gang" is defined and proven at trial. "Assembly Bill 333 made

the following changes . . . : First, it narrowed the definition of a 'criminal street gang' to require that any gang be an 'ongoing, *organized* association or group of three or more persons. [Citation.] Second, whereas section 186.22, former subdivision (f) required only that a gang's members 'individually *or* collectively engage in' a pattern of criminal activity in order to constitute a 'criminal street gang,' Assembly Bill 333 requires that any such pattern have been '*collectively* engage[d] in' by members of the gang. [Citation.] Third, Assembly Bill 333 also narrowed the definition of a 'pattern of criminal activity' by requiring that (1) the last offense used to show a pattern of criminal gang activity occurred within three years of the date that the currently charged offense is alleged to have been committed; (2) the offenses were committed by two or more gang 'members,' as opposed to just 'persons'; (3) the offenses commonly benefitted a criminal street gang; and (4) the offenses establishing a pattern of gang activity must be ones other than the currently charged offense. [Citation.] Fourth, Assembly Bill 333 narrowed what it means for an offense to have commonly benefitted a street gang, requiring that any 'common benefit' be 'more than reputational.' " (*People v. Tran* (2022) 13 Cal.5th 1169, 1206.)

"Because Assembly Bill 333 essentially adds new elements to the substantive offense and enhancements in section 186.22—for example, by requiring proof that gang members 'collectively engage' in a pattern of criminal gang activity, that the predicate offenses were committed by gang members, that the predicate offenses benefitted the gang, and that the predicate and *underlying offenses provided more than a reputational benefit to the gang*—we agree with our colleagues in the Second District that the prejudice standard articulated in *Chapman v. California* (1967) 386 U.S. 18, 24, (*Chapman*) applies. [Citations.] Under that standard, the absence of

8

instruction on the amended version of section 186.22 requires reversal unless 'it appears beyond a reasonable doubt that the error did not contribute to th[e] jury's verdict.'" (*People v. E.H.* (2022) 75 Cal.App.5th 467.)

For reasons that are not clear in the record, despite that the underlying trial occurred well after the effective date of Assembly Bill 333, the court instructed the jury with a definition of criminal street gang that predated the changes made by Assembly Bill 333. Moreover, the People's gang expert testified that one of the benefits to the Fontana Tracc Gang was that the murder would enhance its reputation. The prosecutor relied in part on the testimony about reputational benefit in closing argument. As the Attorney General concedes, "the possibility that the jury relied on the reputational benefit to the gang as its basis for finding the gang enhancements and gang-murder special circumstance allegation true cannot be ruled out. Therefore, the instructional error was not harmless under the *Chapman* standard." We agree.

The failure to properly instruct the jury on the definition of a criminal street gang undermines both the true finding on the special circumstance that Cover committed murder to further the activities of a criminal street gang, and also the 3–year enhancement on Count 2 pursuant to section 186.22.

## DISPOSITION

On remand, the court is instructed to vacate the jury's true findings on the special circumstance that Cover committed murder to further the activities of a criminal street gang, and also on the finding that Cover committed the crimes described in Counts 1 and 2 for the benefit of a criminal street gang. The court is instructed to vacate the 3–year prison term enhancement on Count 2. In all other respects, the judgment is affirmed.

SANCHEZ, ACTING P. J.

WE CONCUR:

MOTOIKE, J.

DELANEY, J.